IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SHERRY SHAW, personally and as | ) | |
| Administrator of the ESTATE OF | ) | |
| WINSTON STROUD, DECEASED, | ) | |
| | ) | |
| PLAINTIFF, | ) | (WO - Recommended for Publication) |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:03-cv-1034-F |
| | ) | |
| COOSA COUNTY COMMISSION, *et al.,* | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## MEMORANDUM OPINION AND ORDER

On October 16, 2003, Sherry Shaw (hereinafter "Shaw") filed suit against the Coosa County Commission (hereinafter "the County Commission"), William A. Evans individually and as Sheriff of Coosa County (hereinafter "Evans"), and fictitious parties.[1]  Shaw brings suit individually and as Administrator of the estate of her deceased father Winston Stroud (hereinafter "Stroud").  Stroud died while he was an inmate in the Coosa County Jail.  In this action, Shaw asserts state and federal law claims against both Evans and the County Commission arising from Stroud's death.[2]

This cause is presently before the Court on Defendant William A. Evans' Motion for Summary Judgment (Doc. # 57).  Evans argues that the Complaint does not meet the

---

[1]  This Court struck all claims against the fictitious parties in an Order dated March 1, 2004 (Doc. # 21).

[2]  The claims against the County Commission have been addressed in a separate Memorandum Opinion and Order.

"heightened pleading requirement" and is legally insufficient to state a claim against him in his individual capacity. Evans contends that the state law claims against him are barred by the Eleventh Amendment of the United States Constitution and Article I, section 14 of the Alabama Constitution. With respect to the federal claims against him, he contends that he is protected by Eleventh Amendment immunity, that he is not a person in his "official capacity" within the meaning of 42 U.S.C. § 1983, that he is entitled to qualified immunity for the claims against him in his individual capacity, and that there is insufficient evidence of the requisite elements of Shaw's claims to send the case to a jury.[3] Shaw has opposed Evans' motion. The Court notes that Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. # 64) is repetitive and, in parts, difficult to comprehend. Nevertheless, this Court has attempted to ascertain the basis of Shaw's opposition to Evans' motion for summary judgment and to evaluate the merits of her arguments. The Court has reviewed the numerous submissions of the parties relating to Evans' motion and finds that it is due to be GRANTED.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1367. Additionally, defendants have not argued that the Court does not have personal jurisdiction over each of them. There is no dispute over whether venue is appropriate.

---

[3] This Memorandum Opinion and Order addresses only some of the bases on which Evans moved for summary judgment. Because the Court finds the bases addressed to be dispositive of Shaw's claims, it need not and does not reach the other grounds urged.

## PROCEDURAL BACKGROUND

Shaw's Complaint contains six counts.  Count One alleges that Evans and the County Commission are responsible for the wrongful death of Stroud.  Count Two alleges that as a result of the conduct of Evans and the County Commission Stroud was caused grievous pain and suffering.  Count Three alleges that "Defendant" negligently trained, hired, counseled, and supervised "the Defendants" and as a result Stroud suffered pain and suffering and died. Count Four alleges that pursuant to §§ 14-6-20 and 14-6-19 of the Code of Alabama, the County Commission has a duty to provide adequate medical care in the county jail and adequate funding for necessary medicines and medical attention to inmates in the county jail. Count Four further alleges that the County Commission breached that duty with respect to maintaining the Coosa County jail and failed to provide necessary medical treatment to Stroud while he was incarcerated in the Coosa County jail.  Count Five alleges that Evans violated Stroud's Fourteenth Amendment right as an inmate to receive reasonable medical treatment and seeks a remedy pursuant to 42 U.S.C. §§ 1983 and 1988.[4]  Finally, Count Six alleges that the County Commission acted with deliberate indifference to the medical needs

---

[4]  In Count Five of the Complaint, Shaw sets forth claims against Evans and "his deputies and/or jailers" pursuant to 42 U.S.C. § 1983.  (Doc. # 1).  The Court notes that the only proper defendants to this action are the Coosa County Commission and Evans.  No other persons have been properly named or served.  In fact, this Court has previously dismissed the fictitious parties purportedly identified in the Complaint.  Evans cannot be held liable pursuant to 42 U.S.C. § 1983 on a theory of *respondeat superior*.  *See, e.g., Monell v. Department of Social Services,* 436 U.S. 658 (1978).  This opinion therefore must focus on the viability of Shaw's claims against Evans for his own conduct, not the conduct of his deputies or jailers.

of inmates in the county jail by failing to provide adequate funding to meet such needs and by failing to provide adequate funding to staff the jail so that personnel is able to perform their duties in such a way as to prevent deprivations of the inmates' rights to medical attention.  In Count Six, Shaw asserts a claim against the County Commission pursuant to 42 U.S.C. §§ 1983 and 1988.  Shaw demands $2,000,00.00 damages on each count and reasonable attorneys fees.

Shortly after being served with the Summons and Complaint, the County Commission filed a motion to dismiss the Complaint (Doc. # 5).  This Court granted that motion in part and denied it in part.  (Doc. # 43).  All claims against the County Commission for punitive damages were stricken.  This Court granted the motion to dismiss all claims which sought to impose vicarious liability on the County Commission for the actions of Evans.  This Court expressly rejected any claims based on the argument that the County Commission was responsible for the day to day operation of the jail or the conduct of the sheriff and his staff.  This Court denied the County Commission's motion to dismiss on the remaining claim because the Complaint alleged a breach of the county's duty to provide adequate funding for medical treatment of and medicines for inmates of the county jail caused Stroud's death.  The County Commission also moved to strike claims against fictitious defendants.  (Doc. # 8).  The Court granted that motion.  (Doc. # 21).  The County Commission filed a motion for summary judgment as to the remaining claims against it.  Shaw did not oppose this motion.  By a separate Memorandum Opinion and Order, this Court has granted summary judgment

4

to the County Commission.

After some difficulty properly serving Evans, Shaw completed service on Evans in January of 2004. Evans filed two motions for summary judgment: one in March of 2004 and one in July of 2005. Because Evans raised essentially the same grounds in each motion, the Court denied the earlier motion as moot. (Doc. # 67). Evans' second motion has been fully briefed and the parties have had ample opportunity to submit argument and evidence in support of and in opposition to the motion. On August 8, 2005, Shaw filed Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. # 64) along with a list of authorities cited in the response and various exhibits (Doc. # 65). Evans filed a reply brief. (Doc. # 70). In addition to the motion for summary judgment, Evans has also filed a motion by which he asks this Court to strike the affidavit of Faye Reynolds which Shaw submitted as part of her opposition to the motion for summary judgment. (Doc. # 69). That motion to strike has been addressed by a separate Memorandum Opinion and Order.

## NARRATIVE STATEMENT OF FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following relevant facts:

Stroud had a chronic problem with alcohol. For nearly a decade prior to his death, he drank on a daily basis. After his retirement sometime between 1992 and 1994, his drinking increased. His family urged him to quit. His doctor repeatedly warned him that his alcohol

use was exacerbating his heart problems[5] and that if he did not quit he could become permanently disabled from a stroke or die from a sudden heart attack.   Despite such warnings, Stroud admitted to his doctor at the end of 1996 that he was drinking at least a half pint of alcohol[6] every day.   Stroud's doctor continued to tell Stroud that he needed to stop using alcohol.   Nevertheless, the last time Stroud saw his doctor in April of 2001, he still reported daily alcohol use.   Further compromising Stroud's health was his failure to take the medications prescribed for his heart disease when he was drinking.

Along with his history of chronic drinking, Stroud also had a history of violent behavior.   Stroud had a history of violence against his wife.   On September 19, 2001 at 11:30 a.m., Rockford Police Chief Mike Arms ("Arms"), and Coosa County Sheriff's Department Investigator Kelley Johnson ("Johnson") were called to Stroud's home due to a report of domestic violence.   Stroud's wife had run from her house to a neighbor's house and called the police.   After arriving at the scene, Johnson and Arms heard Stroud threaten to shoot his wife and kill her.   Stroud also said that he had hit his wife in her side and arm with the butt of a 30-30 caliber rifle.   Stroud was arrested and charged with Domestic Violence Assault and Domestic Violence Menacing.   Arms took Stroud to the Coosa County Jail for booking.

A friend and former-school mate who worked at the Coosa County Jail called Shaw

---

[5]   Stroud had suffered two heart attacks prior to his death: one was somewhere between 1992 and 1994 and the second was on December 31, 1997.  Stroud also suffered from high blood pressure.

[6]   His alcohol of choice was Jim Beam whiskey.

6

and informed her about the incident between her parents and her father's arrest.  The following morning, Shaw went to bail her father out of jail.  She waited until the morning after his arrest because she was hoping he would sober up while in jail.  When Shaw bonded her father out, he was kind of unstable and wobbly in his walk.  She asked him if he needed to be taken to the doctor, but he said he was alright.  Believing he did not need immediate medical care, Shaw did not take Stroud to the doctor.  Stroud returned to his home where he lived alone until the date of his sentencing.[7]  Between his release from jail on bond and his sentencing, he drank daily.  It is not clear whether or not he was taking any of his prescribed medications during this time.

Stroud was scheduled for sentencing on October 17, 2001.  When Shaw had seen her father earlier that day he was pale, but he was not shaking or trembling and did not appear to her to be under the influence of alcohol.[8]  Of course, Shaw had not been with Stroud and could not say for sure whether or not he had been drinking the night before or even that morning.  Shaw did not bring her father to the courthouse.  A male relative named Donnie did.  Shaw and her mother did not sit with Stroud in the courtroom, but according to them he was shaking and appeared kind of stooped.  District Judge Robert J. Teel, Jr. called Stroud and his wife to the bench.  Stroud asked his wife to let him hold on to her arm as they

---

[7] Stroud's wife was living in Florida with family members at this time.

[8] There is some evidence in the record before this Court that Stroud may have been drinking the morning of his sentencing, but due to the procedural posture of this matter, the Court will accept as true Shaw's representation that Stroud did not appear to be under the influence of alcohol.

approached the bench.  Judge Teel recommended six months in jail on the domestic violence charge.[9]  Stroud asked Judge Teel if he could go through a weekend program.  Judge Teel denied the request and sentenced Stroud to six months in the Coosa County Jail.  Judge Teel did explain that the jail sentence would be suspended upon Stroud's satisfying the Court that he had arranged to attend an alcohol abuse program, the content of which program is to the satisfaction of the Court.

While Stroud's wife believed that Stroud needed medical care at the time of the sentencing to "get the DT's out of [him]," she did not tell Judge Teel that Stroud needed medical care.  Similarly, Shaw did not request any medical attention for Stroud at the sentencing hearing.  Importantly, Stroud did not make any requests for medical attention at the sentencing hearing.

Evans was present in the courtroom during the sentencing, but he did not observe anything which caused him to believe Stroud needed medical attention.  Evans did not see Stroud again after he left the courtroom.

After Stroud was sentenced, he was taken to the front of the courtroom to empty his pockets.  He gave his personal belongings to Donnie Stroud.  Shaw and her mother left the courtroom.  Sheriff's Deputy George Long was providing courtroom security.  He escorted Stroud to the Coosa County Jail for booking and incarceration.  It appeared to Deputy Long

---

[9]  Stroud had entered a plea of guilty to domestic violence in the third degree in violation of Ala. Code § 13A-6-132 (1975).

that Stroud was very nervous about having been sentenced.  Prior to leaving the courtroom, Stroud said something to Deputy Long about not being able to make it in jail.  On his way to the jail, Stroud was overheard saying "I can't go there.  I am going to die" and asking repeatedly that someone "call Sherry."

It was the policy and procedure of the Coosa County Jail to complete a Medical Screening Form on each inmate as the inmate was booked into the jail.  It is undisputed that Evans did not require the persons completing the Medical Screening Form to have any special medical training.  It is also undisputed that persons being checked into the jail were not evaluated by a doctor or nurse.  The Medical Screening Form system relied on the ability of jail personnel to observe health problems of incoming inmates and on the ability of inmates to accurately provide information about their own physical and mental health.

Due to the large number of people being booked into the jail that day, Deputy Long completed the booking record and medical screening form on Stroud in order to assist the jail staff.  At the time of his incarceration, Deputy Long did not independently observe any need for medical care for Stroud.  Moreover, Stroud did not request medical attention.

In completing the screening form, Deputy Long specifically asked Stroud, who was 72 years old, if he was taking any medications prescribed by a doctor and Stroud said that he was.  Stroud did not specifically identify those medications, nor did he tell Deputy Long that he needed the medication.  It was the policy and procedure of the Coosa County Jail that when inmates indicated that they were taking medication, the response should be noted on

the form and told to a jailer.  The medical screening form for Stroud's October 17, 2001 booking into the jail discloses that Stroud had high blood pressure.  Although Stroud had on previous bookings also indicated that he had a heart condition, he did not do so on October 17, 2001.  Stroud did indicate that he had attempted suicide or was thinking about it at that time.  Stroud also indicated that he regularly used alcohol or street drugs and that he had problems when he stopped drinking or using drugs.

At some point, Stroud was placed in an observation cell.  Such cells are used to house inmates thought to be suicidal, under the influence of drugs or alcohol, violent, or suffering from a medical condition.  A camera trained on the observation cell sends a continuous video feed of the entire cell to a monitor in the tower.

No one from Stroud's family contacted the jail, attempted to call Stroud, or came by the jail to see him on the day of his incarceration, October 17, 2001.  Mike Peppers, a Coosa County Deputy Sheriff and friend of Shaw, did stop by to see Stroud and to speak with him about God.  On the afternoon of October 17, 2001, Peppers stopped by Shaw's store and told her about this conversation with Stroud.  They did not discuss anything about Stroud's physical condition, his medical status, or his medications.

On October 18, 2001, Shaw called the Coosa County Jail.  She spoke with a jailer named Faye Reynolds ("Reynolds").  Reynolds told Shaw that Stroud had just had a bath and that he had said that the bath made him feel better.  Shaw did not discuss any aspect of Stroud's medical condition or medications with Reynolds, nor did Shaw inquire about

10

Stroud's shakes or state that he needed medical care.

At no point between his incarceration in the Coosa County Jail on October 17, 2001 and his death did Stroud request medical care or medications. Jail policy would have allowed him to see a medical professional if he had requested it. Additionally, while jail policy provides that it is the inmate's responsibility to have any medications brought to the jail if the inmate needs to take the medication while incarcerated, it is undisputed that jail personnel have on other occasions gone to pick up medication needed by an inmate when requested.

On the night that Stroud died, there were two correctional officers on duty at the jail. The officers on duty on the night that Stroud died were experienced and well-trained in Evan's policies and procedures. One of the correctional officers on duty at that time had completed the State of Alabama's eighty-hour jail management course and the forty-hour jail supervisor's course. This correctional officer had also been a licensed EMT for four to five years and had previously worked for the Alexander City Fire Department as an EMT.

Around 6:00 p.m. on the evening of October 18, 2001, Deputy Long heard Stroud banging on his cell door. Deputy Long went to Stroud's cell and talked to Stroud in an effort to get him to stop banging on the door. Stroud asked Deputy Long to open the door, but Deputy Long told him that he could not. Stroud asked for some water. Deputy Long could see a clear plastic cup half full of water in Stroud's cell and he told Stroud to drink the water that he had. Deputy Long walked back to the dispatch area. A short time later, Stroud banged on the door again. Deputy Long went back to Stroud's cell and asked what he

needed.  Stroud again stated that he needed some water.  Deputy Long noticed that the water was on the floor next to the door and running out of the cell under the door.  Deputy Long accused Stroud of having poured his water out.  Stroud did not respond.  Deputy Long left the cell area after telling Stroud that he couldn't open the door to give him any more water. Before leaving the jail, Deputy Long told a jailer named Sheldon Hutcherson ("Hutcherson") that Stroud had poured the water out of his cup.

Around 7 p.m., Hutcherson spoke to Stroud through the door of the observation cell. Stroud told Hutcherson that he wanted to go home.  Hutcherson told Stroud that he could not let him go home because he had to serve his time.  It did not appear to Hutcherson that Stroud was in any physical distress or in need of immediate medical care at that time.  Stroud did not request medical care.  At various points throughout the evening, Hutcherson checked on Stroud and noticed nothing unusual about him.

During this time, Kay Taylor ("Taylor"), another jailer, was working her post in the Tower or Observation Post, within the Coosa County Jail.  From the Tower, Taylor could see into four different pods or cellblocks of the jail.  She also had access to a computer, telephone, walkie-talkie and a monitor with a split screen that showed sixteen different views of areas in the jail.  One of those sixteen views was a camera feed from the observation cell which housed Stroud.  Taylor knew that her job included keeping a close watch on any inmate in the observation cell.  She was trained to make it a priority to watch the observation cell on the monitor.  On the evening of October 18, 2001, Taylor and Hutcherson kept in

12

radio contact about how Stroud was doing.

Later that evening, Hutcherson and Taylor each noticed that Stroud appeared to be sitting on his bunk, leaning up against the back wall of the observation cell, and sleeping. Stroud had been in the jail before and he usually slept sitting on the bunk and leaning against the back wall. Stroud remained in this position throughout the night. At no time did Taylor see anything on the monitor that led her to believe that Stroud was in any kind of physical distress or in need of any kind of medical attention. Similarly, Hutcherson passed Stroud's cell a number of times that night and checked on Stroud. Stroud never requested medical attention. Hutcherson never observed anything that would indicate that Stroud needed medical attention.

Very early on the morning of October 19, 2001, Taylor noticed that Stroud had not changed positions in several hours. Taylor called the other jailer on duty, Hutcherson, and asked him to check on Stroud. When Hutcherson arrived at Stroud's cell at about 1:47 a.m., he saw Stroud sitting upright. Hutcherson entered the cell and touched Stroud. Upon touching Stroud, Hutcherson realized that Stroud was dead. Hutcherson checked Stroud and ascertained that he did not have a pulse and he was not breathing. Hutcherson immediately called for an ambulance and for the Sheriff.

The Coosa County Coroner was called to the jail and arrived at 2:54 a.m. on October 19, 2001. He pronounced Stroud dead at 3:00 a.m. The Coroner reviewed the videotape images of Stroud in his cell. Stroud's last change of position occurred around 9:00 p.m.

Based on viewing the videotape, the Coosa County Coroner estimated Stroud's time of death at around 9:00 p.m. on October 18, 2001.

Dr. Ward of the Alabama Department of Forensic Sciences performed an autopsy on Stroud. Dr. Ward's report concludes that Stroud's cause of death was arteriosclerotic cardiovascular disease and that the manner of death was natural. Stroud's arteries through out his body were blocked. His coronary arteries had significant blockage. All of major blood vessels in the brain were severely blocked as well. Stroud also suffered from arteriolar nephrosclerosis. His lungs were severely damaged by emphysema. His liver was observed to have fatty degeneration. The autopsy makes no findings of any indication that Stroud was suffering from delirium tremens or symptoms associated with delirium tremens.

At the time of Stroud's death, Evans was the Sheriff of Coosa County. Evans was elected six times to serve four year terms as Sheriff of Coosa County, and Stroud's death occurred during Evans' last term as Sheriff of Coosa County. As Sheriff, Evans was responsible for operating the Coosa County Jail and the Sheriff's Department. The day to day operation of the Coosa County Jail was left to correctional officers who were expected to follow jail policy set by Evans. Evans' correctional officers were experienced and well-trained in the applicable policies and procedures. Nothing which had occurred prior to Stroud's death gave Evans any reason to believe that his correctional officers were incompetent and could not be trusted to faithfully carry out their duties. Pursuant to Evans' policies, inmates could request medical attention when they believe they need it.

14

Additionally, jail staff members can obtain medical care for inmates even without a request for such care from the inmates.  In the past, jail staff have sought medical care for inmates. Prior to Stroud's death, there had only been one other person who died in the Coosa County Jail during Evans' tenure as Sheriff and that person did from a sudden hemorrhage.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, *or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id.* at 322-23 (emphasis added).

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

## DISCUSSION

### A.  SHAW'S CLAIMS AGAINST EVANS PURSUANT TO 42 U.S.C. § 1983

#### 1.  Claims Against Evans in His Individual Capacity

Count Five of the Complaint brings suit against Evans pursuant to 42 U.S.C. § 1983.  This statute provides a remedy when a person acting under color of state law[10] deprives a plaintiff of a right, privilege, or immunity secured by the Constitution, laws, or treaties of the United States.  *See, e.g.,* 42 U.S.C. § 1983;[11] *Graham v. Connor*, 490 U.S. 386, 393-94

---

[10]  In this case there is no dispute that at the time of the events giving rise to this suit, Evans was acting under color of state law.

[11]  Section 1983 provides in relevant part:
   Every person who, under color of any statute, ordinance, regulation,
   custom, or usage, of any State or Territory or the District of Columbia,
   subjects, or causes to be subjected, any citizen of the United States or

(1989) ("§ 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (internal quotes omitted); *Cummings v. DeKalb County*, 24 F.3d 1349, 1355 (11th Cir. 1994), *cert. denied,* 513 U.S. 1111 (1995). Count Five of the Complaint alleges that Evans violated Stroud's Fourteenth Amendment right to due process by acting with deliberate indifference to Stroud's serious medical needs. (Compl. at ¶¶ 29-35). Specifically, Shaw alleges that Evans failed to screen Stroud in order to determine the proper care he needed and by not ascertaining whether Stroud was in need of immediate treatment, medicine, or medical attention despite his obvious condition. *Id.* Shaw further alleges that Evans had knowledge of the seriousness of Stroud's medical condition "via his appearance" and knew that Stroud's condition would be exacerbated by a failure or delay in providing necessary medical treatment. *Id.*

Evans contends that qualified immunity protects him from Shaw's claims against him in his individual capacity.

> A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity. To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law

---

other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

occurred.  Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity.  In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was "clearly established" at the time he did it.

*Crosby v. Monroe County,* 394 F.3d 1328, 1332 (11th Cir. 2004) (internal citations omitted).

Thus, this Court must first determine whether Evans was engaged in a discretionary function by considering whether the acts Evans undertook are of a type that fell within his job responsibilities as Sheriff of Coosa County.  To determine whether an official was engaged in a discretionary function, a court must ascertain "whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'" *Id.* (citation omitted).  It is clear that setting policies and procedures regarding medical screening for jail inmate, medical treatment for jail inmates, training for jail staff, and other policies relating to the jail administration challenged in this lawsuit were squarely within Evans' job responsibilities as Sheriff of Coosa County.  Thus, it is undisputed that Evans was acting within the scope of his discretionary authority when the allegedly wrongful actions occurred.  Given that Evans has shown that he is entitled to seek the protection of qualified immunity because he was performing a discretionary function, the burden now shifts to Shaw to show that Evans is not entitled to qualified immunity.

Evans contends that Shaw fails to establish a claim for the violation of Stroud's rights

under the Eighth Amendment.[12]   The Court agrees.  To explain why, the Court will first

outline the nature of the protections provided by the Eighth Amendment and the case law

which establishes the nature of the burden of proof on a plaintiff seeking to raise a claim for

the violation of Eighth Amendment rights.

The text of the Eighth Amendment to the United States Constitution prohibits the

infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  Obviously, this

provision on its face says nothing about medical care due inmates.  *Marsh v. Butler County,*

*Ala.,* 268 F.3d 1014, 1038 (11th Cir. 2001) (*en banc*).  The Supreme Court inferred the right

to such care in *Estelle v. Gamble,* 429 U.S. 97 (1976) and the contours of that right have been

---

[12]  Shaw's Complaint characterizes the constitutional violation in this case as being a violation of Stroud's rights under the Fourteenth Amendment.  Doc. # 1 at ¶ 31.  It is undisputed, however, that at the time of his admission to the Coosa County Jail on October 17, 2001, Stroud was not a pre-trial detainee, but rather a convicted prisoner serving a sentence on a charge to which he had plead guilty.  "A government official's treatment of a pre-trial detainee is governed by the Due Process Clause of the Fourteenth Amendment, while the Cruel and Unusual Punishment Clause of the Eighth Amendment governs an official's treatment of a convicted prisoner."  *Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1425 n.6 (11th Cir. 1997).  Accordingly, Shaw's claims must necessarily arise under the Eight Amendment, not the Fourteenth Amendment as alleged.  Nevertheless, the Court notes that the Eleventh Circuit Court of Appeals has held that the "minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner; both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's deliberate indifference to serious medical needs."  *Id.*  Moreover, the Circuit has explained that cases under either standard establish what constitutes deliberate indifference and has relied on such cases interchangeably.  Shaw's Complaint is replete with allegations that Evans acted with deliberate indifference.  The Court will construe the Complaint as alleging a violation of Stroud's Eighth Amendment rights.

shaped by subsequent case law.  *Id.*

> Although the United States Constitution does not require comfortable prisons, neither does it permit inhumane ones.  The Eighth Amendment governs the treatment a prisoner receives in prison and the conditions under which he is confined.  However, not every government action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny.  After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment.

*Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003) (internal citations and quotations omitted).  Courts addressing claims under the Eighth Amendment have further clarified that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer v. Brennan,* 511 U.S. 825, 828 (1994).  Such a violation can arise where a jail official acts with deliberate indifference to the serious medical needs of an inmate.  *See, e.g., Marsh,* 268 F.3d at 1038; *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999) ("It is well settled that the deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment.") (internal quotations omitted); *Lancaster,* 116 F.3d at 1425.  However, not every claim that a prisoner has not received adequate medical treatment states a claim for a violation of the Eighth Amendment.  *See, e.g., Estelle,* 429 U.S. at 105; *McElligott,* 182 F.3d at 1254.  "A prison custodian is not the guarantor of a prisoner's safety."  *Popham v. City of Talladega,* 908 F.2d 1561, 1564 (11th Cir. 1990).

The definition of deliberate indifference for purposes of claims such as those raised

in this lawsuit has been clarified through a series of lawsuits.  In *Estelle,* the Supreme Court established that deliberate indifference was the applicable standard.  *McElligott,* 182 F.3d at 1254.   Nearly twenty years later, the Supreme Court further clarified the meaning of "deliberate indifference" in *Farmer*.  *Id.*  The Supreme Court held that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837.  Thus, "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."  *McElligott,* 182 F.3d at 1255.   The Eleventh Circuit Court of Appeals has explained that summary judgment must be granted for the defendant official unless the plaintiff presents sufficient evidence from which a reasonable jury could find that the official had subjective knowledge of the relevant risk and disregard of that risk by conduct that is more than mere negligence, but it has acknowledged that such evidence may be circumstantial.  *See, e.g., McElligott,* 182 F.3d at 1255; *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious." *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176,

1186 (11th Cir. 1994) (internal citations and quotations omitted).   In this Circuit, a serious

medical need is "one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize the necessity for a doctor's

attention." *Hill,* 40 F.3d at 1187[13] (quotation marks and citation omitted).  *Accord, Farrow,*

320 F.3d 1243.  "In either of these situations, the medical need must be one that, if left

unattended, poses a substantial risk of serious harm."  *Farrow,* 320 F.3d at 1243 (internal

citations and quotations omitted).

        In some respects, this case is unlike previously reported cases from the Eleventh

Circuit in which Eighth Amendment rights are addressed.  It is undisputed that Stroud failed

to disclose all of his relevant medical history during his medical screening on October 17,

2001.  It is undisputed that neither Stroud, nor his family ever apprised Evans of Stroud's

medical condition or his history of health problems.  It is also undisputed that Stroud never

requested his prescription medication while in jail and that he never asked to see a health

professional between the time that he was booked into jail on October 17, 2001 and the time

he died.  It is undisputed that Stroud's family never spoke to Evans about his medical

condition or history of health problems.  It is undisputed that on the evening of his death,

Stroud's appearance did not in anyway indicate that he was ill.  At most he appeared to have

gone to sleep after making some demands for water and to be let out of his cell.  It is

---

        [13]  In *Hope v. Pelzer,* 536 U.S. 730 (2002), the Supreme Court critized part of the
qualified immunity analysis in *Hill*, but not *Hill's* analysis of what constitutes a serious
medical need of prisoners.  *Farrow,* 320 F.3d at 1243 n.12.

undisputed that Evans did not see Stroud after he left the Courtroom on October 17, 2001. This case is not like the cases where inmates or their families requested medical treatment and were ignored or rebuffed.  This is not like the cases where medical needs involving obviously life-threatening conditions warranted emergency medical care which was not provided.  After reviewing the evidence in the light most favorable to Shaw, the Court finds that no reasonable jury could find that Evans knew that Stroud had a serious medical condition that required immediate medical treatment.  Furthermore, no reasonable jury could find that Evans failed to provide Stroud with medical treatment with knowledge that failure to do so posed a substantial risk of serious harm to Stroud.

To the extent that Shaw attempts to establish her claims against Evans by attacking his policies regarding booking, supervision, staffing, or training at the Coosa County Jail, rather than relying on his knowledge of Stroud's condition alone, she has failed to create a triable issue.  "An official cannot be held liable just for instituting a facially constitutional policy." *Marsh,* 268 F.3d at 1036.  None of the Evans policies which Shaw has challenged are facially unconstitutional.  Thus, the question is whether the policies were unconstitutional as applied.

To rely on this theory, Shaw must show that there is evidence of a causal connection between Evans' policy making activities and an alleged constitutional deprivation.  To defeat Evans' motion for summary judgment, Shaw must show that there is evidence from which a reasonable jury could find that Evans' customs, policies, or procedures resulted in

deliberate indifference to Stroud's medical needs in violation of the Eighth Amendment. This she cannot do.

Shaw's opinion about the adequacy of the medical staffing of an institution is not a sufficient basis for sending the case to the jury; there must instead be some credible evidence that the alleged staffing deficiencies caused Stroud's death. *See, e.g, Free v. Granger,* 887 F.2d 1552, 1556 (11th Cir. 1989). There is no such evidence here. The undisputed evidence is that inmates requesting medical treatment receive it and that inmates are given health screens upon admission to jail, there cannot be said to be a policy of refusing to provide needed medical treatment to inmates or of failing to ascertain whether inmates need medical treatment.

The necessary causal connection can be established when a history of widespread problems puts the responsible policymaker on notice of the need to correct the problem to avoid constitutional deprivations of the relevant type and he fails to do so. *See, e.g., Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir. 1990). For this reason, "[u]nless a policymaker knows of the need to train an officer in a particular subject area, no liability can arise from failure to train him." *Marsh,* 268 F.3d at 1037. There is no evidence from which a reasonable jury could find that Evans had any knowledge of a general risk to inmates caused by his booking, supervision, staffing, or training policies. Based on his experience in more than three decades he worked for the Coosa County Sheriff's Department, Evans had every reason to think that the system of medical care provisions and inmate supervision was

sufficiently effective.  Indeed, the standard procedures followed at the Coosa County Jail regarding the screening of inmates for health problems demonstrate an effort to assure that those held there are safe and a lack of deliberate indifference to the needs of inmates for medical care.

For these reasons, Evans is entitled to judgment as a matter of law on the claims against him in his individual capacity pursuant to 42 U.S.C. § 1983.  Accordingly, his motion for summary judgment will be GRANTED as to those claims.

**2.  Claims Against Evans in His Official Capacity**

Shaw's claims against Evans in his official capacity pursuant to 42 U.S.C. § 1983 must be dismissed as a matter of law because Evans is immune from suit in his official capacity pursuant to the Eleventh Amendment to the United States Constitution.  A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity or Congress has abrogated the state's immunity.  *See, e.g., Lancaster,* 116 F.3d at 1429.  Neither of those exceptions apply in this case.  To the extent that Evans is sued in his official capacity as Sheriff of Coosa County, he is sued as an executive officer of the State of Alabama.  *See* Ala. Const. art. V § 112.  Indeed, the Eleventh Circuit Court of Appeals held that "an Alabama sheriff acts exclusively for the state rather than for the county in operating a county jail." *Turquitt v. Jefferson County,* 137 F.3d 1285, 1288 (11th Cir.), *cert. denied,* 525 U.S. 874 (1998).  Suits against Alabama sheriffs in their official capacities regarding the operation of county jails are suits against the State of Alabama which

are barred by the Eleventh Amendment to the United States Constitution.  *See, e.g., Marsh,* 268 F.3d at 1028; *Taylor v. Adams,* 221 F.3d 1254, 1256 (11th Cir. 2000), *cert. denied,* 531 U.S. 1077 (2001) (affirming summary judgment to Alabama sheriff on Eleventh Amendment immunity grounds as to all claims pursuant to 42 U.S.C. § 1983 brought against sheriff in his official capacity concerning operation of the jail); *Lancaster,* 116 F.3d at 1429 (approving district court's dismissal of § 1983 claims against Alabama sheriff in his official capacity on the grounds that sheriff was a state official).

The result is no different in this case.  Eleventh Amendment immunity bars Shaws' claims against Evans pursuant to § 1983 to the extent that those claims are brought against him in his official capacity.[14]  Accordingly, Evans is entitled to judgment as a matter of law on such claims and his motion for summary judgment on that ground is due to be GRANTED.

## B.  SHAW'S STATE LAW CLAIMS AGAINST EVANS

Shaw has included in her Complaint a variety of claims against Evans pursuant to Alabama law.  Evans contends that he is immune from suit pursuant to Alabama law under Article I § 14 of the Alabama Constitution of 1901.  The Court agrees.

Pursuant to Article I, § 14 of the Alabama Constitution of 1901, "the State of Alabama

---

[14] Given that Shaw's response to Evans' motion for summary judgment on this issue appears to merely restate the arguments made in Evans' brief, it would appear that Shaw concedes that Evans is entitled to summary judgment on the § 1983 claims against him in his official capacity.

shall never be made a defendant in any court of law or equity." *Id.*  In accordance with

Article I § 14's sovereign immunity provisions, courts applying Alabama law have routinely

held that sheriffs are executive officers of the State of Alabama who, with a few exceptions,

are absolutely immune from suit on state law claims. *See, e.g., Tinney v. Shores*, 77 F.3d

378, 383 (11th Cir.1996) ("Under Alabama law, sheriffs and deputy sheriffs, in their official

capacities and individually, are absolutely immune from suit when the action is, in effect, one

against the state.").[15]

The only exceptions to state sovereign immunity for a sheriff or deputy are "actions

brought (1) to compel him to perform his duties, (2) to compel him to perform ministerial

---

[15] In surveying Alabama law regarding the outer limits of sovereign immunity for sheriffs, the Eleventh Circuit has observed some confusion in Alabama courts, such that there is "no clear answer" as to whether sovereign immunity protects sheriffs or deputies sued in their individual capacities for malicious or intentional wrongdoing. *McMillian v. Johnson,* 101 F.3d 1363, 1364-65 (11th Cir. 1996) (collecting Alabama cases and noting inconsistencies).  However, this Court need not be troubled by such uncertainty, because the *McMillian* court, applying *Tinney,* has adopted an unambiguous interpretation of Alabama law, pursuant to which "a claim against an Alabama sheriff in his individual capacity is barred by the doctrine of sovereign immunity," even if that claim is based on malicious or intentional wrongdoing. *McMillian*, 101 F.3d at 1365 (reversing trial court finding that sheriff was not entitled to immunity for individual-capacity claims of malicious prosecution, abuse of process and outrage); *Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1430 (11th Cir. 1997) ("Under Alabama law, a claim against an Alabama sheriff in his individual capacity is barred by the doctrine of sovereign immunity."); *Adams v. Franklin,* 111 F. Supp. 2d 1255, 1272-73 (M.D. Ala. 2000) (finding that state law claims seeking monetary damages from sheriff and deputies in individual capacities for assault and battery, negligence, intentional infliction of emotional distress, and outrage were barred by sovereign immunity doctrine, pursuant to *Tinney* ).  Thus, this Court is subject to a binding interpretation of Alabama law under which sheriffs are absolutely immune from state law claims in their individual and official capacities, even if they are sued for actions that are malicious, intentional or otherwise outside the scope of their authority.

acts, (3) to enjoin him from enforcing unconstitutional laws, (4) to enjoin him from acting in bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law, or (5) to seek construction of a statute under the Declaratory Judgment Act if he is a necessary party for the construction of the statute." *Parker v. Amerson,* 519 So. 2d 442, 443 (Ala. 1987).  These exceptions manifestly do not apply where a sheriff is being sued for money damages, rather than for injunctive relief.  *See Tinney,* 77 F.3d at 383 ("under Article I, § 14, the only exceptions to a sheriff's immunity from suit are actions brought to enjoin the sheriff's conduct," not actions for damages).

It is undisputed that Shaw's claims against Evans pursuant to Alabama law are brought against him individually and in his official capacity as Sheriff of Coosa County for his alleged acts and omissions as Sheriff of Coosa County.  It is equally clear that the Complaint demands judgment on each count in the sum of $2,000,000 and costs.  While the Complaint also includes a general statement that "Plaintiff requests all other relief which justice requires regardless of whether such relief is specifically requested," there is simply no way to read the Complaint as seeking any specified relief other than monetary damages. Shaw has not maintained that any of the *Parker* exceptions apply; indeed, she cannot credibly do so, inasmuch as she is plainly suing Evans, the former Sheriff of Coosa County, for money damages, not injunctive relief.  Accordingly, Evans is entitled to judgment as a matter of law on all of Shaw's claims against him pursuant to Alabama law and his motion for summary judgment on those claims is due to be GRANTED.

28

**CONCLUSION**

For the foregoing reasons, it is ORDERED that Defendant William A. Evans' Motion for Summary Judgment (Doc. # 57) is GRANTED.  The Court will enter a separate final judgment consistent with this Memorandum Opinion and Order.

DONE this 26th day of October, 2005.


_____
          /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE